## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ ) | |
| ) | |
| OPAL FINANCIAL GROUP, INC., ) | |
| ) | Case No. 3:08-cv-1403 (CSH) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| OPALESQUE, LTD. and MATTHIAS KNAB, ) | **NOVEMBER 3, 2014** |
| ) | |
| Defendants. ) | |
| _____) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND
## JUDGMENT AFTER BENCH TRIAL

**HAIGHT, Senior District Judge:**

This is an action for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and Connecticut common law. The Court enters this Ruling following a bench trial.

### I.  INTRODUCTION

Plaintiff Opal Financial Group, Inc. ("OFG") is a New York corporation which describes itself as furnishing "services of organizing and conducting educational conferences in the field of financial investment and finance." First Amended Complaint [Doc. 51] at ¶ 5.

Defendant Opalesque, Ltd. ("Opalesque") is a Republic of Cyprus corporation. Defendant Matthias Knab is domiciled in Munich, Germany and a citizen of the Republic of Germany. Knab is the President and CEO of Opalesque.

Plaintiff owns the trademark "OPAL FINANCIAL GROUP," registered with the U.S. Patent and Trademark Office. Plaintiff contends in this action that Defendants infringed Plaintiff's trademark. Plaintiff also alleges a claim of unfair competition under Connecticut common law. Plaintiff seeks injunctive and monetary relief. Defendants deny any liability to Plaintiff, and assert a counterclaim against Plaintiff for unfair trade practices, in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, *et seq*.

Defendants Opalesque and Knab moved for summary judgment before District Judge Droney (as he then was), the trial judge originally assigned to the case. Judge Droney denied that motion in an Order [Doc. 77] which recited in its entirety: "There exist genuine issues of material fact, including the existence and extent of consumer confusion." Thereafter, Judge Droney denied reconsideration of that Order [Doc. 84]. Upon his elevation to the Second Circuit, the case was reassigned to the undersigned.

A bench trial was held before me. Counsel for the parties filed post-trial Proposed Findings of Fact and Conclusions of Law. Counsel then argued the case, ably and at length, at a final hearing. This Ruling decides the case. What follows constitutes the Court's Findings of Fact and Conclusions of Law, pursuant to Rules 52(a)(1) and 52(a)(2) of the Federal Rules of Civil Procedure. Judgment will enter pursuant to Rule 58.

## II.   INITIAL FINDINGS OF FACT

The Findings of Fact appearing in this Part are based upon testimony of trial witnesses the Court finds credible, and exhibits admitted into evidence at the trial.

1.  Plaintiff OFG is the owner of the trademark OPAL FINANCIAL GROUP, Reg. No.

3,417,605, issued as a service mark by the United States Patent and Trademark Office on April 29, 2008.  The Registration describes the trademarked service as follows:

> FOR: ORGANIZING AND CONDUCTING OF EDUCATIONAL CONFERENCES IN THE FIELD OF FINANCIAL INVESTMENT AND FINANCE, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

The Registration notes "FIRST USE 1-1-99, IN COMMERCE 1-1-99," and goes on to recite:

> THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

> NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "FINANCIAL GROUP", APART FROM THE MARK AS SHOWN.

2. Abraham Wellington, the founder and CEO of OFG, was the principal witness for Plaintiff at the trial.  His description of the nature of OFG's business, which I accept, was that: "We do institutional investment financial conferences.  They are educational in nature, and also a good place that people come to network" – these are "institutional and high net worth investment finance conferences."  Tr. 52.[1]

3. The attendees at the conferences OFG organized and conducted were of a particular sort and type.  Wellington, asked by his counsel on direct examination whether OFG conferences would "be directed to a single investor [such] as a homeowner," responded: "No.  They are very sophisticated investors, accredited, things of that nature, hedge funds, private equity funds, things of that [nature]."  Tr. 52.  The trial evidence shows that because conferences of the sort organized by OFG run over several days at expensive resorts, interested funds or investment firms generally

---

[1] "Tr." references are to the Trial Transcript.  "Network," used by Wellington as a verb (the word is also a noun), has come into common parlance only recently, but the concept is as old as human nature.  It is fair to say that the bishops attending the First Council of Nicaea in A.D. 325 were *networking*, although the Early Church did not use the phrase.

3

do not incur the expense of sending junior executives to attend them.  Senior officers or owners are more likely to appear.  Fund or company exhibition booths are set up.  Logos are prominently displayed.  Lobbies, bar rooms, private dining spaces for communal breakfasts, lunches and dinners, enable attendees to meet and greet each other.  Scores of business cards are given or received; some may even be retained.  In short, the attendees at these conferences are networking.  Their hedge or equity funds, or at least some of them, were making a great deal of money.  The attendees hope that during their attendance, they will learn things from panel speakers,  meet new prospects, and make more money.

4.  The denizens of this special world, those who organize and attend such conferences,  have developed their own language.  While the glossary appearing in ¶ 5, *infra*,  is drawn principally from Wellington's testimony, Tr. 60-61,  the evidence in the record shows that these definitions are generally accepted in the industry.

5.  **Glossary**

The participants at these conferences are called **co-chair people, moderators, panelists** and **attendees**.  These words require no further definition.

The **host** of a conference is the **producer** of that conference.  OFG is the **host** of the conferences it organizes and produces.  In addition, there are **sponsors** and **media partners**.

A **sponsor** is typically a firm that pays money to the conference producer, with a view toward increasing the strength of the sponsor firm's brand.  A sponsor attends the conference; sometimes a firm representative is a speaker; the firm displays its logo and exhibits materials.

A **media partner** is typically an industry newsletter or comparable company which engages in an exchange of advertisements with a conference producer with respect to a conference.

4

"You know, you list your logo on your website, we will list your logo on our website, things of that nature, for that particular conference."  Wellington, Tr. 61.

6.  Wellington testified  that OFG was created in early 1998 and produced its first conference of this nature in or about September of 1998.  He estimated that through the end of 2008, 15,000 to 16,000 different individuals had attended OFG conferences (some repeated subsequently), and the present total was about 20,000.  Tr. 57-58.  I accept these estimates, which seem reasonable and are not controverted by the evidence.  OFG has competitors in the organization and production of such conferences.  With arguably pardonable pride, Wellington ranked his company as number 1 in the field, and added: "I think if you ask people in the market, in the community, they view us in the top 3," based upon "number of conferences, topics covered, number of attendees, revenue, things of that nature, and also brand reputation."  Tr. 58-59.  I need not parse this subject further.  The evidence at trial makes it clear, and I find, that at the relevant times OFG was a successful industry leader in the organization and production of this sort of conference.

7.  Defendant Opalesque, Ltd. is a company registered in the Republic of Cyprus.  Defendant Matthias Knab, a resident of Germany, owns and directs the operations of Opalesque.  Knab was Defendants' principal witness at the trial.  He testified that "I'm basically an IT guy.  I worked in IT for 10 years," Tr. 224.  "IT" is the abbreviation for "information technology," defined by Random House Kernerman Webster's College Dictionary (2010) as "the development, implementation, and maintenance of computer hardware and software systems to organize and communicate information electronically."  Knab began in the IT business in 1988.  In 2000 he started publishing a newsletter which focused on the ascent of electronic trading within the online brokerage community.  Knab established links within the relatively new and rapidly developing hedge fund industry, and perceived

a need for a daily, independent and inclusive news service for hedge fund operators and investors. In 2003, Knab's company Opalesque (which acquired its name in 2002) began publishing a daily online newsletter focused on hedge funds and "investment alternatives" (a phrase denoting investments other than stocks and bonds, such as real estate or fine art).  This financial news service combined "proprietary industry news stories and filtered third party reports," according to the Opalesque Website, Def. Ex. BB.  At trial Knab gave this description, more enthusiastic than grammatical, of his product's genesis:

> I'm a programmer/systems analyst myself.  And I saw all the opportunity here to bring daily news to use technology, e-mail this, etc., to use this type of technology in a sphere which is hedge funds that until then, we're talking about 2003, was still very obscure and not well discussed.

Tr. 224.

8.  Opalesque has succeeded.  Knab regards his business product with the same parochial pride Wellington displays toward OFG: number 1 in the world (in Opalesque's case, the collection and daily electronic dissemination of information relevant to the world of hedge funds and alternative investments).  Knab testified that at the present time, Opalesque has "80,000 users, clients, subscribers, visitors on the website.  And to those 80,000, we have e-mailed , if I sum up all the subscriptions that they have, it's half a million people, half a million digital copies of our e-mails per week."  Tr. 220.  I accept that evidence of business volume; there is no evidence in the record to contradict it.

9.  At its inception, Opalesque made its news compilations available online without charge, but now the company charges users an access fee.  Opalesque has developed additional informational publications in specialized areas; for example, in 2008 the company presciently launched "Opalesque

6

Islamic Finance Briefing."   Knab testified, and I accept, that "We have now launched 21 publications.  Right now we're publishing 21, so every couple of months a new one is being added." Tr. 218.  I find on this evidence of publication and distribution, which I also accept, that during the years from 2003 to the present, Opalesque has achieved a dominant position as a media and information company servicing the hedge fund and alternate investment industries.

10.   Publication of hedge fund industry news is not all that Opalesque and Knab do. Beginning in 2003 (under circumstances described in ¶ 11 *infra*), Knab has become an inveterate – in a different context, one might say compulsive – attender of hedge fund conferences.  He testified that since 2003,

> I have attended probably hundreds of events around the globe, not only as a participant, but as a speaker, as a moderator, as a chairman, as a host, as a panelist, and I cannot think of another media company that has this high visibility and involvement in hedge fund conferences.  I have literally traveled one million air miles around the globe attending hedge fund conferences.  I've been to 12 U.S. states repeatedly.   I've been 20 to 30 times to New York, 10 times to Chicago, eight times to Florida, five times to Boston, three times to Dallas, etc., five times to San Francisco.  Where? At hedge fund events.  I've traveled to 36 countries, that is all continents.  That's basically almost all continents and all of the large countries, and that's in America, starting from Argentina, Brazil, Peru, Colombia.  I've been to South Africa, New Zealand, Australia, Hong Kong, Singapore, Japan, Bombay, Dubai, Stockholm, London, Paris, Amsterdam, Zurich, Geneva, Madrid.  All these cities I had an active role in conferences, I mean speaking, moderating, chairing; and, therefore, it's very hard of me [*sic*] to think of another media company that has this amount of visibility.

Tr. 227-28.  Knab recited this travel itinerary in an animated fashion, uninhibited by modesty.  He was responding to a question put by counsel for OFG, who had said to Knab that "your [deposition] testimony was that you're the only publication that has such a strong involvement in the conference

business.  Is that correct?" Tr. 226.  Having asked the question, counsel had to endure Knab's answer.

When Knab eventually fell silent, counsel departed for other climes; he said to Knab: "Okay. Let's

 look at one of your publications."  Tr. 228.  I accept Knab's testimony on this point as truthful and

accurate.  There is nothing in the record to contradict it.  On the contrary, Knab's constant attendance

at and participation in hedge fund conferences around the world is consistent with Opalesque's

proven prominence as a media company in the industry.  Moreover, Knab's stature in the hedge

company world is consistent with the manner in which OFG and Opalesque came to enter into a

business relationship with each other.

11.  In June 2013, David Schwartz, an employee at OFG, and Matthias Knab exchanged e-

mails on the subject of a "European Alternative & Institutional Investing Summit" that OFG was

scheduled to produce at a hotel in Fiuggi, Italy on September 14-16, 2003.  Schwartz hoped to obtain

Opalesque as a media partner for that conference, and he succeeded in that effort.  On July 2, 2003,

Schwartz sent Knab an e-mail, Def. Ex. 2, which read:

> Dear Matthias:
>
> Just confirming our conversation yesterday whereby we agreed that
> Opalesque will help to market Opal Financial Group's upcoming
> European Alternative Investment Summit in Fiuggi, Italy September
> 14th-16th.  In exchange, Opal will include your company's name in
> its outgoing e-mail promotional literature for this conference.
>
> If any business results from this effort, Opal Financial will give
> Opalesque a more prominent placing (logo, etc.) in the conference
> brochure, which will go to print approximately 1 month before the
> conference starts.
>
> Best regards,
>
> David

OFG and Opalesque proceeded in accordance with that agreement.  As he testified, the Fiuggi conference was the first hedge fund conference Knab attended.  It was something of an Epiphany: Knab has been criss-crossing the globe to hedge fund conferences ever since.

12.  This e-mail illustrates the mutual, reciprocal benefits that a conference organizer and a media partner derive from the relationship.  Each conference attracts or is supported by a number of media partners.  I accept Wellington's testimony that OFG's conferences "typically have, I would say 30 to 60 media partners per event, and it's an advertising exchange."  Tr. 130.  That about sums it up, to which one would add the industry practice that the conference organizer typically gives an attendance-fee discount of, say, 10% to an individual who registers for the conference through a media partner.

13.  Opalesque acted as a frequent media partner for OFG hedge fund conferences during the period 2003 through 2005.  That relationship then dwindled away, for reasons that the evidence does not clearly establish, one way or the other.  Knab testified as to a possible cause, but his testimony is speculative, and I need not dwell on the subject further because it is irrelevant.  Whatever the reason for Opalesque's withdrawal as a frequent OFG media partner, the two companies dwelt on the same planet in harmony, or at least without animosity, until certain events occurred in 2008, about which I heard a good deal of evidence.

14.  Wellington of OFG testified that during the summer of 2008, he was having lunch with Barbara Schoenfeld, the former deputy treasurer of the State of Rhode Island.  Schoenfeld alarmed Wellington when she described an earlier meeting she had "with a large group of people, and they were sitting around and there was a lot of confusion about Opal and Opalesque and which [*sic*] each other's companies roles were and who was doing what."  Tr. 104.  Schoenfeld began her lunch

conversation with Wellington by informing him that Opalesque "was hosting an event in Connecticut

called the Global Alpha Forum,"  Tr. 104, scheduled to be held in Greenwich, Connecticut on

September 16-18, 2008.  Wellington testified that upon hearing this,

> I was very, very upset, because we put a lot of money and pride into
> our brand name, and I went back to my office immediately and called
> my business attorney, who put me in touch with our current counsel
> for this.

> I guess subsequent to, I guess you becoming counsel for this case, you
> discovered that they were also doing hedge fund workshops, which
> I was not aware of.

Tr. 105.  The last-quoted words were addressed by Wellington during his direct trial testimony to

Michael S. Culver, Esq., OFG's trial counsel, whose Arlington, Virginia law firm (Millen, White,

Zelanao & Branigan) was retained in the manner Wellington described in his testimony to protect

OFG's trademark interests in the face of conduct by Opalesque that OFG regarded as infringing.

15.  The "hedge fund workshops," whose existence Mr. Culver and his firm discovered and

reported to OFG, were organized and produced by Opalesque in July and August, 2008.  The

promotional literature, Def. Ex. DD, is printed under the "Opalesque" logo, and begins with the

statement: "Opalesque Presents its Inaugural Series of Hedge Fund Workshops."  Four workshops,

involving a variety of speakers and panelists, were scheduled, each at the Yale Club in New York

City, from 8:30 a.m. to 12:00 p.m. on Tuesday mornings, July 22, July 29, August 5, and August 12,

2008.  The literature described the workshops as offering "Expert Insights and Unique Perspectives

on Alternative Investments," and added: "These workshops are designed to give hedge fund

professionals a better understanding of specific issues concerning the hedge fund industry." Def. Ex.

DD at 1, 2.

16.  In his testimony, Knab acknowledged the role Opalesque played in these hedge fund workshops.  He described the project as "a joint venture that we had with Janice Johnson at that time to produce the Breakfast Series."  Tr. 285.  Janice Johnson was a New York resident who had been engaged for some years in the organization of conferences offering state-authorized professional credit to lawyers and CPAs.  Tr. 288.

17.  Attorney Culver signed and mailed to Knab at an address in Germany a letter dated August 15, 2008, on the Millen, White stationery, Def. Ex. X, which identified the firm as representing Opal "in trademark matters."  The letter described Opal as "in the business of producing conferences" since 1999, which had "gained growing global recognition for its educational products and services for the financial sector," and had registered the name OPAL FINANCIAL GROUP as a trademark.  "It has recently come to Opal's attention," counsel's letter to Knab continued, "that your company is associating its name – Opalesque – with educational conferences that directly compete with the services of Opal," which causes "actual confusion in the marketplace" and "is clearly an infringement of Opal's trademark rights."  Presumably, what had "recently come to Opal's attention" was the planned September conference in Greenwich, revealed by Schoenfeld during her lunch with Wellington, and the four Yale Club breakfast workshops, discovered by Millen, White's sleuthing. Culver's August 15, 2008 letter to Knab demanded, in the classic "cease and desist" style, that "your company cease all use of its name, and any similar variation of the word 'opal,' in association with educational services for the financial industry, including sponsoring and/or conducting any conferences, workshops, forums, etc."  Knab was asked to sign his name on the second page of the letter, under the typed phrase "SEEN and AGREED."

18.  Culver's cease and desist letter of August 15, 2008 reached Knab in Europe, and led to

an exchange of e-mails between Knab and Culver, Def. Ex. V. At one point, on September 5, 2008 at 8:02 a.m., Knab e-mailed Culver: "The Opal letter has been signed and will be sent by air mail." But Knab never sent Culver the endorsed letter. The subsequent e-mails included Culver's repeated inquiries about where the signed letter was, and Knab's descriptions of Opalesque's history and recent conduct, together with suggestions that the matter be discussed by the principals of the two companies. Such a meeting was never arranged. Knab testified at trial that while abroad, he signed the letter, but never sent it to Culver because "in the end I objected to it." Tr. 294.

19. The Global Alpha Forum took place in Greenwich, Connecticut on September 16-18, 2008. The promotional brochure, Def. Ex. AA, stated that "The 2008 Global Alpha Forum brings together leaders from the alternative investment industry, academia and government," and made reference to "the 2007 inaugural forum." The first page of the brochure contains the phrase "Hosted By." Directly below that phrase, two depictions appear, side by side. To the left is the circular logo of the Connecticut Hedge Fund Association. Next to it is the word "Opalesque," printed in a distinctive script the company has used since its inception. Directly beneath those two logos, a printed instruction reads: "For questions or to register by phone, please call the Connecticut Hedge Fund Association at 203-319-1902." At the Forum, Knab made an introductory speech. He spoke, as did other speakers and panelists, in front of a large banner-like object fastened to the wall, which recited at the top "Global Alpha Forum," and reproduced in the middle section the same two logos, of the Connecticut Hedge Fund Association and Opalesque, this time much larger, with the Association's logo placed above that of Opalesque. *See* third photograph in Def. Ex. Z.

20. On September 16, 2008, OFG filed its complaint in this action [Doc. 1], accompanied by a motion for a preliminary injunction [Doc. 5]. The case came before then District Judge Droney,

who did not have to rule on OFG's preliminary injunction motion, because the parties presented to him a Consent Order [Doc. 43], signed by Judge Droney on November 4, 2008, which contained substantially the same injunctive provisions.   The Consent Order provides that Defendants Opalesque, Ltd. and Matthias Knab

> shall be preliminarily enjoined from the sale, offering for sale, advertising, conducting, organizing, sponsoring, hosting or providing any educational conference, workshop, forum, seminar or the like that uses the mark Opalesque, or any other mark that is likely to cause confusion, deception or mistake (1) with Plaintiff's marks OPAL FINANCIAL GROUP or OPAL, (2) as to Plaintiff's affiliation, connection or association with such educational events, or (3) as to the origin, sponsorship, or approval of such educational events by Plaintiff.

The preamble to the Consent Order recites that "By consenting to the terms in this Order, Defendants make no representations as to the merits of Plaintiff's lawsuit, and specifically deny all allegations and any alleged wrongdoing."

21.   Subsequent to the entry of the Consent Order, Opalesque organized and promoted through its publications a series of online panel interviews, where the interviewer ("moderator") was an Opalesque representative and the interviewees ("the panel") were prominent figures in the alternative investment world.   Opalesque called these programs "webinars."   They are accessible online to paying subscribers to one or another of  Opalesque's several electronic news media services.   OFG contends in this action that Opalesque's webinars violate the Consent Order and infringe OFG's mark.   OFG prays that the Order be made permanent, Opalesque be held in contempt of its terms, and Opalesque be enjoined from further infringement of its mark OPAL FINANCIAL GROUP by Defendants' use of the mark OPALESQUE in connection with these webinars. Opalesque and Knab contend that the Consent Order does not apply to webinars, and their use of the

mark OPALESQUE in connection with the webinars does not infringe OFG's mark.

22.    Opalesque has not organized any hedge fund conferences subsequent to the four "breakfast conferences" at the Yale Club in July and August 2008, which were attended by only about 25 people at each session and caused Opalesque to lose money.  Opalesque also cancelled two all-day hedge fund conferences it had proposed to hold at the Crowne Plaza Hotel in New York City, one on November 10, 2008 and the other on January 12, 2009.  Knab testified at trial that these actions were taken in part because of OFG's cease and desist letter, although he acknowledged that the disappointing returns on the earlier conferences and the economic downturn may also have been factors.  The evidence does not permit a more precise finding than that on the point.

23.  With respect to the manner in which the parties acquired their trade names, the facts are these:

The root word is "opal," a noun referring to a jewel which the Oxford English Dictionary (Compact Edition 1984) defines at page 1993 as follows: "An amorphous form of hydrous silica, somewhat resembling quartz, but in certain species exhibiting a delicate play of colour; these when cut are valuable as gems."  The OED tells us that opals were brought to the Western World from India; the first recorded use of the noun in the English language occurred in 1398.

According to Abraham Wellington's testimony, which I accept, he founded the company that came to be called "Opal Financial Group".  The company held its first conference in September of 1998. Tr. 53.  Wellington testified further concerning the manner by which he chose a name for his new company:

> When I founded the company, there were no companies with any name resembling Opal in the industry.  Most of the companies had primarily three letter acronym names, like IMN, IR, IQRPC, SRI, II, things of that nature.  I wanted to come up with a name that was very

> distinctive and not like any of the other names.  I guess the term
> "opal" obviously is a gemstone, it has nothing to do with conferences,
> so it's very specific, and it's easy to spell.  Additionally, my mother is
> a jeweler and when I was a little boy, I helped her make jewelry and
> it was kind of a tip of the hat.  We are very close.  I thought it would
> be a nice name for the company.

Tr. 53-54.  I accept this testimony as well, with its sensible expression of a desire to avoid confusion

among companies engaged in the conference-producing business and charming manifestation of

filial devotion.

As for Matthias Knab, he started publishing his electronic-trading newsletter in the year

2000.  The venture proved successful, and Knab desired a name for his company.  According to

Knab's testimony, which I accept, in 2002 Knab acquired a list of about 100 different companies

which had registered their names with the authorities of the Republic of Cyprus, but were not

actively using those names.  It appears that Cyprian law or procedures allowed someone like Knab

to come along, select and purchase the name of one of those "pre-registered companies," Tr. 296,

and use it for his own active venture.  Knab testified: "So I looked through these companies, and I

said I like that name, I'm buying this, I'm not buying the other one.  So I was just buying a company

shell." Tr. 296.  The name Knab bought was "Opalesque."

Knab did not testify, and was not asked, about why he liked the name "Opalesque."  It could

reasonably be inferred that Knab was drawn to "opal" because it is one of those lovely words

evocative of beauty, tranquility, affluence, and other good things in this life.  But the question need

not be pursued because the answer is irrelevant.  The relevant inquiry in this trademark infringement

inquiry is whether Defendant Knab chose the name OPALESQUE *in good faith*, that is to say,

without intent to appropriate or trade upon Plaintiff's OPAL FINANCIAL GROUP trademark, or to

mislead consumers as to the source or sponsorship of Defendant's services.[2]  On the evidence adduced at trial, I find that Defendant Knab  acted in good faith when he  chose and offered services under the trade name OPALESQUE.

### III.  FURTHER FINDINGS OF FACT AND DISCUSSION

**A.**     **The Relevant Marketplace**

OFG's federal trademark infringement claim against Opalesque and Knab is based upon the Lanham Trade-Mark Act, whose principal provisions are found in § 32(1), 15 U.S.C. § 1114(1), and § 43(a), 15 U.S.C. § 1125(a).  The Second Circuit summarized the purpose and effect of the statutory scheme in *Virgin Enterprises, Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003):

> A claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed under the familiar two-prong test. . . . The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.

(citations omitted).  The district court in *CJ Products LLC v. Snuggly Plushez LLC*, 809 F.Supp. 2d 127, 150 (E.D.N.Y. 2011), citing *Virgin Enterprises*, stated the proposition somewhat more precisely:

> In order to vindicate a claim for false designation under the Lanham Act, the plaintiff must satisfy a two-part test, showing that: (1) the plaintiff has a valid trademark entitled to protection; and (2) a likelihood that *the defendant's mark* will cause confusion in the marketplace.

(emphasis added).

The case at bar is  concerned only with possible infringement of OFG's *registered* trademark

---

[2]     The summary of "good faith" recited in text is adapted from District Judge Weinfeld's opinion in *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220, 1230 (S.D.N.Y. 1977).

under § 1114(1), rather than a trademark *acquired by use* under § 1125(a).  While OFG began using

its OPAL FINANCIAL GROUP mark as early as 1999, it registered the mark on April 29, 2008.

Opalesque did not begin the allegedly infringing conduct until it organized the Yale Club breakfast

conferences in July and August, 2008.  It follows that if Opalesque infringed OFG's trademark at all,

it infringed a registered mark.   The distinction is in part procedural rather than substantive, since the

tests for liability are the same.   But it is necessary to understand what conduct on Opalesque's part

is alleged by Opal to be infringing, and what conduct is not.   That distinction is central to a

determination of whether OFG has proved that an infringement occurred.

The distinction in question is clearly articulated during Wellington's sometimes edgy cross-

examination by counsel for Opalesque, which it is useful to quote at some length:

> Q.  Mr. Wellington, going back a bit in our questioning, you've
> admitted having media partnerships with the Defendants starting in
> 2003 through 2005; correct?
>
> A.  That sounds correct, yes. . . .
>
> Q.  Okay. So your primary basis for your trademark infringement is
> the Defendants' participation in the Global Alpha Forum in
> Connecticut; is that right?
>
> A.  No, I wouldn't say that's right.  I guess my basis for it is his
> [Knab's] hosting at the Global Alpha Forum and also hosting the
> breakfast series.
>
> Q.  And you have an objection to him being a host at events?
>
> A.  Just to be clear, by using the word "host," like I defined in my
> direct testimony, I have an objection to him being a host under that
> testimony, yes.
>
> Q.  Well –
>
> A.  That definition, excuse me.

17

Q.  Well, yes, you are defining it as somebody who is an event organizer; right?

A.  Yes. I would.

Q.  Can a host, you know, just be a host, as somebody who greets people?  Isn't that a host too?

A.  When you go into a conference and see a coat-check person, you can say thank you to the hotel [*sic*], in some sense they are the host, but I would never use that word.  I use the word to define a person who the event is being sold under their brand name. . . . You can use the word "host" in many ways, but I think it's generally understood, the host is the person who is the purveyor, I guess provider of the conference, producer, things of that nature.

Q.  And you have an objection to Mr. Knab ["Matthias" in the transcript] being a host at conferences; is that clear, your clear position?

A.  No, that's not what I said.  I think you, in the deposition, you were I guess trying to confuse me with the word – the definition of the word "host," and I think to make some sort of clarity to everybody, how I define the word "host" is the person who is selling their product under their brand name or producing the conference,

    If you are trying to get me to acknowledge, do I have a problem with him – his brand being put forth as the producer of the conference?  Yes, I do, because it confuses the market and causes us damage.

Q.  Right. But that's because you are defining host now as producer or organizer of an event, but doesn't the word "host" just mean to greet, a person who greets.

A.  Are you asking me for a definition of "host"?  Sure.

Q.  And I think, you know, the human population understands that word.

A.  Sure.  If you look in the dictionary, the word "host" would be to greet somebody, as a coat-check person at the hotel, the person at the front desk, all these different people would greet people.  But I try to

18

make it clear for –

   Q.  I'm talking about –

   THE COURT: Finish your answer.

    COUNSEL:  I'm sorry.

    THE WITNESS: I really wanted to make it clear for the purposes
of this Court to understand.  I guess my concern is – I guess just to be
clear, I have no issue with him speaking as a newsletter, welcoming
people, co-chairing as a newsletter.  The issue is when he was – there
was conferences that were sold under his brand name.

   Q. [by counsel for Defendants, resuming his cross-examination]:
Well, every media partner has his brand name in connection with a
conference, don't they, Mr. Wellington?

   A.  Not the same way as what you are referring to now, no.  They
are in the back of the brochure as compared to on the front top of the
brochure.   I assume you are referring to the agenda.

   Q. I'm assuming [*sic*, probably should read "referring"] to whatever
you are referring to.

   A.  Sure.  In the majority of things that go out, the media partner is
listed in the back.

   Q.  So you are saying today, it's your testimony that Opalesque was,
because it was the host at the Global Alpha Forum, that it was not
representing itself as the online publication, but was instead
representing itself as the conference organizer?

   A.  Correct, that and also the hedge fund workshop in New York
City.

Tr.  177-82.

    This testimony is significant because it spells out the Plaintiff's conception, for trademark

infringement purposes, of "the marketplace" as that phrase is used in cases like *CJ Products*, which

requires a Lanham Act false designation claimant to show a likelihood that the defendant's mark will

cause confusion "in the marketplace."  809 F.Supp.2d at 150.  According to the view expressed by Mr. Wellington with admirable clarity, the relevant "marketplace" in the case at bar is made up of (1) companies or entities that organize and produce, and proclaim themselves to be organizing and producing, conferences about hedge funds and other alternative investments, and (2) companies or individuals interested in attending conferences on those subjects.

This is a specialized, relatively narrow and limited marketplace.  It does not include every person or entity attending or participating in a hedge fund conference.  For example, the marketplace defined by Wellington does not include a media partner, whose partnering and advertisement-swapping relationship is with a company like OFG, which *does* organize and produce conferences. For that reason, the similarity perceived by Plaintiff in the parties' trademarks (*OPAL* FINANCIAL GROUP for Plaintiff and *OPALESQUE* for Defendants), which Plaintiff stresses in its briefs and argument, did not trouble OFG in the least during the period 2003-2005, when Opalesque maintained a prominent presence and displayed its trade name in promoting and attending conferences organized and produced by OFG.  Plaintiff never claimed or suggested that Defendants' use of the mark OPALESQUE while acting as a media partner infringed upon Plaintiff's OPAL FINANCIAL GROUP mark.

**B.**    **The Core Question on the Trademark Infringement Claims**

The case for Plaintiff is that Defendants became infringers when that entity called Opalesque began to organize and produce hedge fund conferences under its own name.

The Court's task in this Ruling is to decide whether, on the evidence adduced at trial, Plaintiff has proved trademark infringements by Defendants in the relevant marketplace sufficient to entitle

Plaintiff to money damages or injunctive relief.

**C.**     **Discussion**

For the reasons stated in Part III.A., OFG's trademark infringement claims are limited to instances of Opalesque's alleged conduct as the organizer and producer of hedge fund or alternative investment conferences.  Activities of a different nature on the part of Opalesque could not be infringing as a matter of law, because such conduct would not occur within the marketplace OFG has defined for trademark protection on its own theory of the case.

OFG contends that the evidence at trial establishes three instances of conduct by Opalesque which infringe OFG's mark: (1)  the Yale Club "breakfast conferences" arranged by Opalesque and Janice Johnson in July and August 2008; (2) Opalesque's and Knab's participation in the Global Alpha Forum, held in Greenwich in September 2008; and (3) Opalesque's more recent and continuing production of online "webinars."

These are discrete instances of allegedly infringing conduct on the part of Defendants.  I will describe their relevant facts separately.  But I begin with a recitation of the governing law applicable to all three of OFG's infringement claims.

**D.**     **The Governing Law**

The federal Trademark Act, 15 U.S.C. § 1114(1), also known as the Lanham Act, provides a civil remedy for infringement of a registered mark.  The statute prohibits the unauthorized use in commerce of "any reproduction, counterfeit, copy or colorable imitation of a registered mark" if "such use is likely to cause confusion, or to cause mistake, or to deceive."  Those who must not be confused, mistaken or deceived are the *consumers* of a defendant's goods or services.

21

The Lanham Act seeks to protect a trademark owner by ensuring that consumers of the owner's goods or services are not fooled by another individual or entity into thinking that the consumers are purchasing the trademark owner's goods or services, when in fact they are purchasing those of another, to that other's illicit benefit.   In the Second Circuit, a claim of trademark infringement "is analyzed under the familiar two-prong test," which "looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the *origin or sponsorship* of the defendant's goods." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citations omitted, emphasis added). To satisfy that second prong, an infringement plaintiff such as OFG "must show that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir. 1993) (citations and internal quotation marks omitted).

In the case at bar, Plaintiff OFG's registered mark, OPAL FINANCIAL GROUP, is entitled to protection.   Defendants Opalesque and Knab do not contend otherwise.   Accordingly, Plaintiff satisfies the first prong of the infringement test.   The case turns upon the second prong, which asks whether Plaintiff has proved by a preponderance of the evidence that Defendants' conduct during the three specified instances   caused the consumers of that conduct confusion as to the "origin or sponsorship" of whatever it was the Defendants were doing.   We may sharpen the focus by posing the questions in this manner:

1. **As to the Breakfast Conferences:** Did Defendants' organization and production of these conferences under the name OPALESQUE confuse those individuals attending the conferences into thinking that Plaintiff OFG organized and produced the conferences, or sponsored those who did?

22

2. **As to the Global Alpha Forum:** Did the listing of Defendant Opalesque as a "host" of the Greenwich conference, and Defendant Knab's participation in the conference, confuse those individuals attending the conference into thinking that Plaintiff OFG organized and produced the conference, or sponsored those who did?

3. **As to the Webinars:** Does the conduct of Defendant Opalesque, in producing online "webinar" interviews with financial industry individuals, confuse those individuals accessing and watching the webinars online into thinking that Plaintiff OFG produced the webinars, or sponsored those who did?

In evaluating whether a trademark owner claiming infringement has satisfied the second prong of the test by showing the likelihood of consumer confusion**,** courts in this Circuit routinely apply the non-exclusive multi-factor analysis developed by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) and consider: (1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006). However, the Second Circuit has also cautioned: "Despite the existence and importance of the Polaroid factors, we must remember that they are merely tools 'designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue,' and that 'the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula.'" *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992). (quoting *Lois Sportswear v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986)).

I turn to whether, in the light of this governing law, OFG has proved its claim of trademark infringement with respect to the three instances of Defendants' conduct revealed by the evidence at trial.  Further findings of fact are required as to each of them.

**E.      Further Findings - The Breakfast Conferences**

Four hedge fund breakfast conferences were held at the Yale Club in New York City on four Tuesday mornings in July and August, 2008.  The evidence shows that Opalesque put on these conferences as a joint venture with Janice Johnson, who held a CPA and JD and had prior experience setting up conferences and seminars for accreditation as continuing professional or legal education.  Thus the Registration Information page in the brochure, Def. Ex. DD, states: "These workshops are recognized by the New York State Education Department and are valid for Continuing Professional Education credits."

As noted *supra*, OFG learned of these conferences through the investigative efforts of trademark counsel, originally retained as the result of OFG's concern about the Global Alpha Forum scheduled for September.  Counsel's cease and desist letter dated August 15, 2008 was addressed to Knab and received by him in Europe several days later.  Knab's immediate response to OFG's counsel was that it did not need to identify itself as an event organizer since the breakfast conference arrangements were really made as an accommodation to Ms. Johnson, and Opalesque was not itself an organizer of the events.  These disclaimers are difficult to sustain in the face of the form and wording of Opalesque's promotional brochure, Def. Ex. DD.  Counsel's cease and desist letter was followed by Opalesque changing the name of one of its operating arms from "Opalesque" to "Altesque" (in an unsuccessful effort to placate OFG), and the cancellation of two later conferences

at a New York City hotel, previously announced under the Opalesque name.  The evidence shows that Opalesque has not, under any name, organized or produced any CPE (continuing professional education) or CPL (continuing legal education) conference or workshop since the Yale Club breakfast conferences in 2008.  In his trial testimony, Knab ascribed these withdrawals from this particular field to a combination of OFG's cease and desist letter and unrelated economic circumstances – the Yale Club breakfast conferences, poorly attended despite their prestigious location, cost Opalesque money, and the broad financial markets started their precipitous decline during the fall of 2008.  In any event, Opalesque ceased and desisted from the organization and production of CPE and CPL conferences after Knab received counsel's cease and desist letter, and has not resumed activity in respect of conferences of that particular sort.

As for the Plaintiff, there is no evidence that OFG has ever organized or produced a conference or other gathering whose attendees received continuing professional education credits.[3] On the contrary: Plaintiff OFG has admitted on the record that it has not and does not organize or produce "professional credit" events.  Those admissions were made in the context of the Defendants' unsuccessful motion for summary judgment before Judge Droney, conducted pursuant to Local Civil Rule 56(a).  Plaintiff's Local Rule 56(a)2 Statement [Doc. 66] contained these responses by Plaintiff to numbered factual assertions by Defendants:

> 47.  Plaintiff does not provide "for professional credit" events like "The Breakfast Series."
>
> Plaintiff's response: Admitted.

---

[3]   I may judicially notice that an event organizer may not simply promise in its brochure that attendees will receive continuing professional education credits.  Application must be made to, and an imprimatur received from, the relevant regulatory agency: on the occasion of the Breakfast Conferences, the New York State Education Department.

48.   Plaintiff does not produce events which offer professional
continuing education to its attendees in New York.

Plaintiff's response: Admitted.

During summations following the bench trial, counsel for Plaintiff contended vigorously that

these responses on its part had no shelf life beyond Defendants' summary judgment motion, which

Judge Droney denied, and were not binding upon Plaintiff as admissions for purposes of the trial.

I disagree.  Defendants filed a Local Rule 56(a)1 Statement which set forth, in the words of that

Rule, "a concise statement of each material fact as to which the moving party contends there is no

genuine issue to be tried."  In the passage just quoted, ¶¶ 47 and 48 were included by the moving

party (Defendants) in its statement of such facts.  The Rule obligated Plaintiff to state, in its

responsive Local Rule 56(a)2 Statement, "whether each of the facts asserted by the moving party is

admitted or denied."  Plaintiff's response to each of the facts in question was "Admitted."  I may

assume that these responses were considered by Plaintiff and made with the advice of counsel.  They

have consequences which extend to the trial.  An important and beneficial purpose of summary

judgment practice is to reduce and refine issues for trial, separating facts that are admitted from those

that are disputed.  To that end, Local Rule 56(a)3 provides that "each denial in an opponent's Local

Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness

competent to testify as to the facts at trial and/or evidence that would be admissible at trial."  The

Rule makes it plain that summary judgment statements are intertwined with the trial of disputed

facts.  Plaintiff at bar cannot be heard to say that its Rule 56(a)2 admissions count for nothing at the

trial.  If Plaintiff did not agree with these particular factual assertions by Defendants, it should not

have admitted them.  Having responded "Admitted" to each assertion, Plaintiff is bound by these

admissions at trial.  If some courts, other than the Second Circuit, have taken a contrary view on this

point, I do not agree with them.

**F.**     **Further Findings – The Global Alpha Forum**

As stated in Part II, ¶ 10, Plaintiff's theory of the case is that Wellington first became aware

of  Defendants' infringing conduct when an acquaintance told him during the summer of 2008 that

Opalesque "was hosting an event in Connecticut called the Global Alpha Forum."  Wellington's

friend was describing a future, planned event.   While there is no evidence on the point, it is

reasonable to infer that she or the unidentified individuals she quoted to Wellington had seen the

Connecticut Hedge Fund Association's brochure marketing the forum, which displayed the

Opalesque name (together with the Association) after the phrase "Hosted By."  Part II, ¶ 19.

Plaintiff did not call any witness to describe what actually transpired at the Global Alpha

Forum.  Wellington, it would seem, did not attend it, nor is there evidence that he instructed anyone

from or on behalf of OFG to attend and report on the event.  Knab attended; P. Ex. ZZ includes a

photograph of Knab addressing the conference room assemblage from the podium at the head table.

But Knab, in his trial testimony, rejected the notion that Opalesque was a "host" of the Forum, as that

role has come to be defined in the glossary of hedge fund conferences.  In Knab's perspective,

Opalesque participated at the Global Alpha Forum in "an active media partnership" with the true

host, the Connecticut Hedge Fund Association.  Eschewing false modesty, Knab expanded upon that

concept during his direct examination:

> Q.  So the scope of your involvement in the Global Alpha Forum
> was what?  Tell us the totality of what you did.
>
> A.  They approached me in 2007 to do a media sponsorship for the

2007 event.  In 2008 they approached me and said, This worked very well.  This time we want to work – we want to make a better use of you.  So we agreed on what we called an active media partnership.  And I think it was plaintiff yesterday who also admitted that sometimes a conference company does work with a media company, and they do talk about topics, and they do talk about speakers.

Now, the reputation that Opalesque has in this industry, and I'm sure you'll ask me about it later, but let me just pre – jump a little bit ahead, is that we have a lot of direct connections to people that are otherwise very hard to reach.  And these connections come from conferences.  This is – this is why the people are so upset, because they say we are synergistic.  I go to conferences.  I get contacts.  Right?  I have my reputation.  I promote a conference.  So my contacts are wide and is an asset.

When a media – when a conference company approaches me and says, Can you help me out?  Yeah, I can help them out, but that doesn't mean I'm sitting there and filling in the registration forms.  That means I give them ideas how to make a better event, and I communicate that.

Q.  Do you do anything involved in the brick and mortar aspect of a conference, you know, securing a hotel, panel space, exhibit halls, selling tickets, anything like that?

A.  No.  This is all the job of the conference company, and they have 50 people doing that, and they have also another – within those 50 people, they have 20 people calling up.  A lot of these inter-conference business tailor sales, so you call on people, you call on sponsors.  You need to secure – I did nothing of that.  And the Connecticut Hedge Fund Association did that together with the Academy Group for the third-party organization.

Tr. 328-29.

I accept Knab's testimony on this aspect of the case.  It is entirely credible, and consistent with the other evidence in the case.  Knab draws a sensible distinction between what a "conference company" does and what a "media company" does.  I find that in September 2008, the time of the Global Alpha Forum, OFG was a conference company and Opalesque was a media company.

Moreover, the evidence demonstrates, and I find the industry practice to be, that each hedge fund conference had one conference company (which organized and produced the event) and a number of media companies clustered about it and listed in the marketing brochure (playing greater or lesser roles as "media sponsors").

In the case at bar, uncertainty arose and the seed for litigation was planted when the Connecticut Hedge Fund Association issued a brochure describing the 2008 Forum which displayed the equally prominent Association *and Opalesque* logos next to each other underneath the printed phrase "Hosted By." Wellington, in his testimony at Tr. 61, defined the noun "host" in the context of hedge fund conferences: "Q. What is the host of a conference? A. The host of a conference is the producer of the conference." If Wellington's summertime luncheon acquaintance or her informants had seen that brochure, they could have formed the reasonable belief that Opalesque was producing the 2008 Global Alpha Forum. That is the impression Wellington's acquaintance conveyed to him in the summer of 2008. Wellington responded with the equally reasonable concern that Opalesque, previously known to OFG only as a media company in the hedge fund world (an activity in which OFG did not engage) was also beginning to organize and produce conferences (the only activity in which OFG *did* engage). It occurred to Wellington that Opalesque might be infringing on OFG's mark with respect to the organization and production – "hosting," if you will – of hedge fund conferences. OFG retained trademark counsel. The litigation die was cast.

The question for decision after trial is whether Plaintiff proved that Defendants' conduct concerning the Global Alpha Forum infringed Plaintiff's trademark. Evidence of what Defendants actually did or did not do, in preparation for or during attendance at the event, is more probative of that question than an indication on a marketing brochure purporting to show what Opalesque had

done or was going to do.

On that precise issue, I find, on the basis of Knab's quoted testimony, which is not contradicted by other evidence in the record, that the usual industry practice was followed on the occasion of the 2008 Global Alpha Forum in Greenwich.  That is to say: The Connecticut Hedge Fund Association was the organizer and producer of the event (just as it had been for the comparable 2007 event).  At the Association's request Opalesque, which had been a media sponsor for the 2007 event, and Knab played a more prominent role at the 2008 event, as reflected by Knab's descriptive phrase "*active* media partnership."  However, Opalesque did not organize or produce the 2008 forum, and was not retained by the Association to do so.  The brochure itself reflects that reality.  Immediately following the "Hosted By" heading and the two logos, the brochure readers were instructed: "For questions or to register by phone, please call the Connecticut Hedge Fund Association at 203-319-1902."  Thus the support troops of the Association, as the event *organizer*, were prepared to perform the administrative functions which Opalesque, as a "media sponsor" or "partner" however "active," would not and did not perform (as Knab testified).[4]  In short: I am unable to find, on the evidence at trial, that Opalesque acted as a "host" or "co-host," as the noun *host* is used and understood in the world of 21st century hedge fund conferences.[5]

---

[4] There is no evidence in the record as to whether individuals at the Connecticut Hedge Fund Association told Knab, before distributing the brochure describing the 2008 Forum, that the brochure would list Opalesque together with the Association under the "Hosted By" caption.  If Knab received advance notice of that designation and approved it, one supposes that he now regrets having done so.  If the Association fashioned that display on its own, Knab may feel some pardonable irritation.  But this question is not material to the analysis stated in text.

[5] That understanding accords with the age-old definition of this hospitable word.  The *Oxford English Dictionary* (Compact Ed. 1984) at 1336 traces to the year 1303 this definition of *host*: "A man who lodges and entertains another in his house; the correlative of *guest*."

30

Whether the Defendants' conduct with respect to the 2008 Global Alpha Forum, as revealed by the evidence at trial, *infringed* Plaintiff's OPAL FINANCIAL GROUP trademark is considered in Part III.H., *infra*.

**G.    The Webinars**

 Opalesque created and marketed to subscribers a number of publications focusing upon one or another aspect of the hedge fund - alternative investment industry.  In 2007 Opalesque founded a weekly web publication called "A SQUARE," described as featuring "unique investment opportunities that bear virtually no resemblance to the main stream hedge fund strategies . . . " Opalesque promotional material, P. Ex. BB.

A SQUARE organized and produced a number of what it referred to as "A SQUARE Interactives."  These were interviews appearing on the website, moderated by an Opalesque staff advisor and consisting of a panel of academics or investment industry executives.  Such a presentation is referred to, in the parlance of today, as a "webinar."  "Webinar" is defined in Wiktionary (visited on 1/14/2010) as: "An interactive seminar conducted via the world-wide web. Usually a live presentation, it happens in real time as users participate through chats, file share, or ask questions with built in microphone." P. Ex. FF.  The more staid Britannica Blog simply defines "webinar" as "a seminar offered by a company via the internet." *Id*.

The sort of webinar implicated in the case at bar is illustrated by P. Ex. EE, an Opalesque electronic newsletter giving notice of a discussion to be held on January 18, 2010.  Opalesque states in that document: "This A SQUARE (Alternative Alternatives) Interactive marks the third anniversary of our A SQUARE publication."  Opalesque urges potential viewers: "Please join us and

our distinguished panelists for insights on liquid assets vs. illiquidity related return premiums." Three panelists are listed, each with a background in academia and/or the investment business. The "Moderator" is identified as "Sona Blessing, Senior Advisor, Opalesque."

Knab described at trial the manner in which an individual gains access to such a webinar. According to his testimony, which I accept, with respect to an A SQUARE publication "you cannot participate in this webinar not having – in this webinar here, you cannot participate without being an Opalesque A SQUARE subscriber. . . . In order to participate, you have to be a subscriber to Opalesque A SQUARE services." Tr. 316-17. That means the individual must have registered on the Opalesque/A SQUARE website and paid the subscriber's fee.

An individual's participation, such as it is, in a webinar of this sort consists of watching the presentation on his or her computer screen, within the confines of home or office, be they ever so humble. The A SQUARE subscriber does not spend two or three days comfortably ensconced in a multi-star resort, with networking opportunities fueled or lubricated by good food or fine wines.

## H.   Infringement of Plaintiff's Trademark

As noted *supra*, this case presents the question whether Defendants' use of the mark OPALESQUE "is likely to cause consumers confusion as to the origin or sponsorship" of Defendants' services and goods. *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Earlier Second Circuit decisions quantify those concepts to some degree: "It is well settled that the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the sources of the goods in question." *Mushroom Makers, Inc. v. R.G.*

*Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) (citation omitted). In an infringement case, the court must determine whether the claimant has proved the existence of that likelihood, and if so, what relief should be fashioned. Confronted with those tasks, district judges in this Circuit routinely look to the several factors identified by Judge Friendly in *Polaroid.* I turn to those factors, and discuss them in somewhat different order.

      **1.**    ***Actual Confusion, Proximity of the Products and Sophistication of the Consumers***

I consider these three *Polaroid* factors together. They frequently overlap; and, as the Second Circuit has observed, the presence or absence of one factor may influence that of another.

      **(a).**  **Actual Confusion**

The "actual confusion" factor inquires whether there is evidence of "consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996) (citation and internal quotation marks omitted). Plaintiff Opal Financial Group presented no direct evidence that any consumers were actually confused about the origin or sponsorship of any services rendered by Defendants Opalesque or Knab in such a manner as to implicate or suggest the involvement of OFG. Which is to say:

(a) No individual who attended the Breakfast Conferences, or contemplated doing so, testified that he or she believed OFG organized, produced or sponsored the Conferences, or thought OFG might have done so.

(b) No individual who attended the Global Alpha Forum, or contemplated doing so, testified that he or she believed OFG organized, produced or sponsored the Forum, or thought OFG might have done so.

(c) No individual who watched an online Opalesque A SQUARE webinar, or contemplated

doing so, testified that he or she believed OFG organized, produced or sponsored the webinar, or thought OFG might have done so.

These gaps in the proof are significant. Although lack of evidence of past or present *actual* confusion is not dispositive of the related but separate question of *likelihood* of future confusion, *McGregor-Doniger,Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1136 (2d Cir. 1979); *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987), the absence of confusion to date "is a strong indicator that the likelihood of confusion is minimal." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983); *Lever Bros. v. Am. Bakeries Co.,* 693 F.2d 251, 257 (2d Cir. 1982). That proposition fully accords with common sense. Opal Financial Group (Plaintiff) and Opalesque (Defendant) had co-existed since 2002, the year Knab selected the company name "Opalesque" from a list of some 100 different pre-registered companies he found in records maintained by the government of Cyprus. If a likelihood of consumer confusion between the two companies existed during the years between 2002 and the trial in 2013, one would expect Plaintiff to present the testimony of at least one of the peripatetic and savvy individuals attending hedge fund conferences that he or she actually *was* confused on that score.

OFG offered no such proof at trial. Instead, Plaintiff places great emphasis upon the account Wellington gave in his testimony of his social, lunch-time encounter during the summer of 2008 with Barbara Schoenfeld, the former Rhode Island office holder. Schoenfeld, Wellington testified, told him that a number of unidentified persons at an undescribed earlier gathering "were sitting around and there was a lot of confusion about Opal and Opalesque and which each other's companies' roles were and who was doing what." In that context, Schoenfeld also told Wellington (Wellington testified) that Opalesque "were hosting an event in Connecticut called the Global Alpha Forum."

34

*See* Part I, ¶ 14.  That event, as we have seen, took place in mid-September 2008.

Wellington's account of what Schoenfeld told him is carefully crafted to resonate with the chords of customer confusion.   But Schoenfeld did not testify at the trial.   Neither did any of her original and unidentified sources.   There is no evidence describing the gatherings, participants or bases for impressions or beliefs that other persons related to Schoenfeld, and Schoenfeld related to Wellington, and Wellington related to the Court in his testimony.

Wellington then turned his testimony to a description of reports about confusion he received from named executives in OFG.   Wellington introduced that subject by saying: "In addition to obviously my meeting with Barbara Schoenfeld, I get regular reports from my senior vice presidents that work in the financial events for our company, and all of the senior vice presidents that manage teams give me reports of confusion and the specific ones to individuals." Tr. 105.   At this point, counsel for Opalesque interposed a hearsay objection.   I received the proffered testimony, but under a limiting ruling as to admissibility, which I will quote:

> THE COURT: Well, it would be admissible in order to explain what this witness did, assuming if he did anything.   And so that's a non-hearsay purpose.   If it's offered for the truth, that seems to me a little different.   The witness is testifying that a witness who is not present to be questioned observes confusion.   I don't think I can receive this kind of testimony for that purpose.   But I can receive the substance of the report made to this witness by someone who reports to him under the hierarchy in order to explain or lay the foundation for whatever this witness then did.   I'll take it for that purpose, if that's where you're going.

Tr. 106.  That ruling allowed counsel for OFG to elicit from Wellington testimony that certain named officers at the company told him about confusion those officers had learned about from other individuals.   These assertions are typical of that testimony: "Douglas Borst, my senior vice president

at Opal, told me he got 2 to 300 phone calls in 2008 and 2009 with confusion between the events."
Tr. 105.   Borst also told Wellington about "many instances of people calling and there was
confusion, who did what, whether he worked with their company, who was producing what
conference." Tr. 107.  Will Rio, another senior vice president, told Wellington "how a lot of the
people we spoke with thought we were similar companies or the same company." Tr. 107.

When it became Knab's turn to testify on behalf of Opalesque, he began to recount how a
number of other persons had told him they were *not* confused as between OFG and Opalesque.
Counsel for OFG – thereby illustrating the truth of the proverb that the order of cross-examination
sometime depends upon whose ox is being gored – interposed a hearsay objection.  I made this
ruling:

> THE COURT: You had Mr. Wellington testify, did you not, about
> what an associate of his said other people said to him on the issue of
> actual confusion.   I think the objections go to weight, not
> admissibility.  I'll allow it.

Tr. 326.  That ruling allowed counsel for Opalesque to elicit from Knab testimony that he sent an
e-mail inquiry to his thousands of subscribers, asking if they were confused in any way about the
respective identity, with these results:

> Q. [by counsel for Defendants]: . . . . [Y]ou had given news about
> this case to your readership?
>
> A. [by Knab] Right.
>
> Q.  What was the reaction from people?
>
> A.  It was an overwhelmingly support [sic].  People were basically
> saying that, you know, this is bogus, this is frivolous, that the two
> companies are distinct and different.  Opalesque is the on-line media.
> These people have been getting, since we started, 250 million e-mails.
> So they know we are the on-line media company, and then Opal

Financial.

In fact, just yesterday, I got a call from a client who used to be the CEO of Instinet, which is a big electronic exchange owned by Reuters. He said, "I'm 20 years in the industry. This is bogus. Nobody confuses the two parties". . . .

Q. How many people, if you recall, responded, how many in numbers?

A. I got personal e-mails back from 300 people.

Q. Did any of those 300 people say, yeah, I'm confused by Opalesque and Opal Financial Group?

A. Actually, these people all said, There is no confusion, I'm not confused.

Tr. 324-26.

On this state of the record, I am asked to believe that at about the time individuals who spoke to OFG officers were telling them that widespread confusion existed in the marketplace about the identities and activities of the two companies, individuals who spoke to Knab were telling him that no confusion between the two companies existed, nor in the circumstances could it have done so.[6]

---

[6]   In its Proposed Findings of Fact and Conclusions of Law, Doc. 132, at ¶ 97, Plaintiff seeks to reargue the Court's ruling limiting Wellington's testimony on the ground of hearsay. Plaintiff contends: "Courts have permitted such evidence of customer statements as falling under the 'state of mind' exception to the hearsay rule under Fed. R. Evid. 803(3)." For that proposition, counsel cite *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997). In *Fun-Damental* the Second Circuit said that the plaintiff "offered the direct testimony of its national sales manager to demonstrate actual confusion. He testified that some retail customers complained because they thought Fun-Damental was selling its Toilet Bank at a lower price to other retailers." The Second Circuit cited with approval and described a Fifth Circuit case, *Armco Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir. 1982), which held that "testimony by plaintiff's employees that customers called for defendant company was admissible to show confusion in [the] minds of [the] declarants." 111 F.3d at 1004.

These cases are distinguishable from the case at bar because, unlike the plaintiffs in the cited cases, OFC did not call as witnesses at trial the corporate officers to whom the out-of-court

Thus far, the Court has confined its discussion of actual confusion to the presence or absence of anecdotal evidence on that subject.  But the trial record also includes a market research survey, and the testimony of the qualified expert who conducted it.  In *Home Shopping Club, Inc. v. Charles of the Ritz Group*, 820 F.Supp. 763, 774 (S.D.N.Y. 1993), I had occasion to say: "Typically, an infringement plaintiff undertakes to prove actual confusion between its products and the defendant's in two ways: anecdotal evidence of particular incidents and market research surveys."  The Second Circuit has said: "Although the absence of surveys is evidence that actual confusion cannot be shown, a trier of fact may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion." *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

The survey in evidence in the case at bar has a somewhat unusual provenance.  The first witness called in Plaintiff OFG's case in chief was William E. Gordon, Ph.D., at the pertinent times

---

declarations of confusion had assertedly been made by consumers.  At least one district court has held that application of Rule 803(3)'s state of mind hearsay exception is conditioned upon the appearance of "a witness who *testified* to out-of-court statements evincing confusion."  *ADT Sec. Servs. v. Sec. One Int'l, Inc.*, No. 11-CV-5149 (YGR), 2013 WL 4766401, at *4  (N.D. Cal. Sept. 5, 2013).  In the view of that court, a case like *Fun-Damental* declares "the far narrower principle that, in Lanham Act cases, a plaintiff's employee may testify in court, subject to cross-examination, as to the content of out-of-court statements that show actual confusion by plaintiff's customers through an act of misidentification." *Id.*  In this case, OFC does not offer the testimony of an employee to whom the out-of-court statements of customers were made.  Rather, OFC offers only the testimony of Wellington, its CEO, about descriptions made to him by non-testifying employees of OFC about statements made to *them* by customers.  If one accepts the reasoning of *ADT Security Services*, those consumer declarations in the case at bar do not qualify for state-of-mind exception from the hearsay rule.  The exception would apply to Knab's testimony, since he personally initiated and received the state-of-mind declarations of *absence* of confusion proffered by his subscribers.

I need not pursue this subject further because my later ruling at trial held that all this evidence would be admitted, subject to considerations of relative weight.  For the reasons stated in text, Knab's testimony, tending to show *absence* of consumer confusion, is entitled to more weight than Wellington's testimony, tending to show *actual* consumer confusion.

a senior vice president at Millward Brown, Inc., a market research consultancy based in New York City. Gordon testified that in October 2008, he conducted "a survey of participants in the hedge fund industry, as to their attitudes and perceptions toward companies also participating in that business, including the two companies in question here today, Opal Financial Group and Opalesque." Tr. 19. His services in that regard were requested by Opalesque and the law firm of Bracewell & Giuliani, predecessor counsel for Opalesque and Knab. Gordon's survey report, P. Ex. G at 2, recites its purpose: "The purpose of the research was to determine the existence of and the extent of confusion between the Opal Financial Group brand and the Opalesque brand among hedge fund industry participants." Gordon and his team used "a computer-assisted telephone interview (CATI) methodology," *id*. at 3, which consisted of interviewers making cold calls to 102 or 103 previously identified individuals in the offices of hedge fund industry companies, asking the 16 questions contained in a questionnaire created for this particular survey, and tabulating and commenting upon the responses thus obtained.

A question of particular significance to the case at bar is stated at page 8 of the survey report, P. Ex. G. That question inquired of the interviewees: "Which of the following statements best describes the affiliation if any between Opal Financial Group and Opalesque?" Respondents were asked to choose between the following responses: "They are one in the same company."[7] **or** "They are jointly owned by a larger company." **or** "They partner together on occasion but exist as separate companies." **or** "To my knowledge they are unaffiliated, separate companies." **or** "Don't know."

---

[7] So in original. I suspect that the author of the questionnaire slipped grammatically, and meant to say "one *and* the same company." In the discussion of this responsive choice appearing in text, I assume that this is what respondents understood that particular choice among multiples to mean.

Dr. Gordon analyzed the differing responses to this question (see Figure 4 at page 9), and made the following finding: "*Confusion between the brands is virtually non-existent*. Respondents were either confident that the two firms are separate companies or didn't know how they were affiliated (82.4% combined)." Ex. G at 8. (emphasis added).

Given that OFG, as the plaintiff in this action, bears the burden of proving the *likelihood* of "confusion between the brands," the proffering of Gordon's survey as a *plaintiff's* exhibit may seem counterintuitive. Perhaps counsel for OFG was seeking to spike a hostile cannon pointing down from the heights counsel was attempting to scale. To that end, counsel's examination got Gordon to acknowledge that his calculations did not include, as a form of brand confusion, the answer made by 3.9% of the respondents that Opal Financial Group and Opalesque are "one and the same company."[8]

Counsel's criticism is valid. Those responses should have been included in that calculation. The point may be granted in OFG's favor, as far as it goes, but it does not go very far. The omitted responses are *de minimis*. In his trial testimony, Gordon did not retreat from the overall finding expressed in his survey that, taken as a whole, "confusion between the brands is *virtually* non-existent" (emphasis added), and I see no reason why he should. Certainly, it cannot be said that this market research survey furnishes evidence of actual confusion. Its effect is to the contrary. Moreover, OFG does not proffer a survey by an expert its attorneys retained which supports a claim of likely confusion. That is a telling circumstance, since an infringement plaintiff's "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." *Essence Commc'ns, Inc. v. Singh Indus.*, 703 F.Supp. 261, 269 (S.D.N.Y. 1988) (citations

---

[8] *See* n. 7, *supra*.

omitted).

### (b).  *Proximity of the Products*

Under this *Polaroid* factor, a district court considers "the degree of proximity between plaintiff's and defendant's areas of commerce." *TCPIP Holding Co., Inc. v. Haar Commc'ns Inc.*, 244 F.3d 88, 102 (2d Cir. 2001).  The relevant question is whether "there is sufficient proximity of goods and services covered that confusion can easily arise if the similarity between the two marks is sufficient." *Id*.  "The 'proximity-of-the-products' inquiry concerns whether and to what extent the two products compete with each other," and courts "look to the nature of the products themselves and the structure of the relevant market."  *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 480 (2d Cir.1996) (citations and internal quotation marks omitted).  The court asks if "there is sufficient proximity of goods and services covered that confusion can easily arise if the similarity between the two marks is sufficient." *TCPIP Holding Co.*, 244 F.3d at 102.  Conversely, if there is no or little proximity between the parties' goods or services, confusion is less likely to arise.  The proposition, *au fond*, is one of common sense.

### (c).  *Sophistication of the Consumers*

In *Cadbury Beverages*, 73 F.3d 474 at 480, the Second Circuit stated that in principle:  "The eighth *Polaroid* factor, 'sophistication of the buyers,' has been called analogous to the proximity factor.  The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." (citations and internal quotation marks omitted).  In practice, the court of appeals regards the likelihood of confusion as lessened in inverse proportion to the sophistication of the buyers or consumers. *See, e.g., W.W.W. Pharmaceutical Co., Inc.*, 984 F.2d at 576:  "Retailers are assumed to be more sophisticated buyers

and thus less prone to confusion." That assumption "is not necessarily valid" in circumstances where "the plaintiff's mark is strong, the defendant's mark is identical, and the products are substantially the same." *Cadbury Beverages*, 73 F.3d at 481. However, the Second Circuit has stated unequivocally: "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." *TCPIP Holding Co.*, 244 F.3d at 102.

In the case at bar, the consumers are those high-ranking executives of hedge funds and other investment entities whose sophistication the Plaintiff not only does not dispute: Wellington proclaimed it in his testimony. *See* Part II, ¶ 3, *supra*. The particular product sought by these particular purchasers is a well-organized conference on financial and investment matters, held amid the comforts of a first-class resort, with unlimited opportunity for networking. The trial evidence shows that this is the product that Opal Financial Group has produced, is producing, and is known for producing, by those in the hedge fund and alternative investment industry. Opalesque is a media company. Its principal products have been and continue to be online electronic publications, which report on and comment upon various aspects of this industry. With the exception of the very limited activities described in this Ruling, Opalesque has not organized or produced a conference in its own name or acquiesced in anyone else suggesting that it did so. In these circumstances, it is appropriate to consider whether such conference attendees are sufficiently sophisticated to avoid confusion as to which of these two companies had organized and produced the conference.

The case at bar is comparable in that regard to *Buitoni Foods Corp. v. Gio. Buton & C. S.p.A.,* 680 F.2d 290 (2d Cir. 1982), in which Buton, an Italian producer of brandies, liqueurs, and aperitif wines, filed a trademark infringement claim against Buitoni, a producer of Italian-style foods which had begun marketing table wines. District Judge Platt held that the sophistication of the buyers of

these products militated against a finding of likelihood of confusion. He reasoned:

> American purchasers of aperitifs are almost by definition members or "would-be" members of the "International Set" and are not likely to purchase by mistake or accident table wines or "vin ordinaire" for their cocktail hour or "moment" or "time to drink ... before lunch or dinner," as it were.

530 F.Supp. 949, 958 (E.D.N.Y. 1981).  The Second Circuit affirmed the district court's holding on that point: "We find no error in the court's finding that consumers of the Buton and Buitoni products at issue are sophisticated enough to distinguish table wine from aperitifs, brandies and liqueurs." 680 F.2d at 293.  In the case at bar, the question is whether attendees at hedge fund conferences are sophisticated enough to distinguish the organizer and producer of the event from one of a number of media or related-service companies acting as sponsors of the event.

*          *          *          *          *

When the *Polaroid* factors of actual confusion, proximity of products, and sophistication of consumers are considered, separately and also in relation  to each other, it is clear that these factors militate against Plaintiff's claim that a likelihood of consumer confusion exists between its trademark OPAL FINANCIAL GROUP and Defendants' trademark OPALESQUE.

Plaintiff has offered no evidence of actual confusion on the part of relevant consumers in the relevant marketplace.  The relevant marketplace is comprised of competing companies which organize and produce financial investment conferences.  The relevant consumers attend such conferences.  For "actual confusion" to occur in that context, a consumer attending a conference, or contemplating doing so, would have to be misled, deceived or simply confused by the OPALESQUE trade name into thinking that OFG organized or sponsored the event.

The only evidence Plaintiff presented even approaching that subject is Wellington's account

of his pre-Global Alpha Forum luncheon discussion with Schoenfeld, who mentioned "a lot of confusion" among other individuals  "about Opal and Opalesque" and what their roles were.  That isolated exchange is insufficient to demonstrate the sort of actual confusion caused by a trademark infringement.  The Second Circuit's reasoning in *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 124 (2d Cir. 2001), is instructive:

> Nora also argues that the district court erred by not weighing evidence of distributor inquiries to Nora sales managers regarding whether Nora was affiliated with other spring water sellers. Nora argues that these inquiries proved likelihood of confusion sufficient to go to trial. We disagree. Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.

The Second Circuit added in *Nora Beverages*:

> Finally, we note that Nora proffered no evidence of direct consumer testimonials or surveys, while PGA presented affirmative evidence of no consumer confusion.

*Id.*  The last-quoted paragraph mirrors the state of proof in the case at bar.  Knab's testimony about the absence of consumer confusion is entitled to more weight than Wellington's second-hand account of consumer confusion reported to him by his subordinates, since Knab personally conducted the relevant inquiries.  Moreover, the only market research survey in evidence demonstrates a lack of consumer confusion, rather than its presence.

The absence of actual confusion demonstrated by this record is not surprising, given the effect of the other two factors under discussion.  The lack of proximity between Plaintiff OFG's principal service (organizing and producing networking conferences of several days' duration at resorts) and Defendants' principal services (online newsletters and brief online webinars *sans*

44

networking), coupled with the consumers' high level of sophistication in the relevant areas of endeavor, militate against a finding that Defendants' use of the trade name OPALESQUE creates a likelihood of consumer confusion with Plaintiff's trademark.

That conclusion is supported by the testimony of a witness for Defendants, Lynelle Jones. Ms. Jones earned an MBA at Cornell, was employed at Salomon Brothers in the late 1970s and then for a decade as a vice president in institutional sales at Goldman Sachs, worked as a consultant to private banks, and now owns a Wall Street firm doing "structured product advisory for private banks and wealthy families." Tr. 548. Jones is a denizen of the financial conference world, particularly since the 1990s, when "with the advent of hedge funds, the development of private equity and the explosion of alternative investments, in addition to the change in technology, conference business really exploded," and "I go to conferences regularly." Tr. 549. Jones testified, and I accept, that she has attended "over 300 conferences," Tr. 549, which are "highly sophisticated conferences," with "high level people that come to these conferences," to participate in the networking function, which is "the specific reason to go to a conference, particularly in this day and age, to make personal – build personal relationships, get out and build informal relationships, talk about issues, learn about products. It's very much physical meet and greet." Tr. 550.

Drawing upon her own professional experience and attendance at such conferences, Jones testified that "everyone in this industry knows Opalesque" as "one of the first and best news aggregators out since the Internet really started in this area." Tr. 550-51. "People know Opalesque for their media – their digital media presence. No one that I know of associates Opalesque as a conference organizer." Tr. 551-52. Opal Financial Group, Jones testified, "runs a variety of conferences globally and is very well-known and very well-respected and regarded as a conference

organizer."  Tr. 554.  Counsel for Defendants put this question to Jones: "Have you ever been confused yourself because of the common word 'Opal' as to who Opalesque is, who Opal Financial Group is and what it is they do and what services they offer?"  Her answer was succinct (although thereafter explained at some length): "No. No one in this industry would be."  Tr. 554.  Jones was an impressive witness.  Her testimony is persuasive.[9]

### 2. *Other Polaroid Factors*

The additional *Polaroid* factors are not as significant in the circumstances of the case, and do not in any event, considered separately or together, demonstrate a likelihood of consumer confusion.

Plaintiff can justly proclaim **the strength of its mark**, OPAL FINANCIAL GROUP,  as an organizer and producer of hedge fund and other financial conferences.  It has used that name since 1998 and has become an industry leader.  However, this factor has built-in limitations.  In *Mushroom Makers*, 580 F.2d at 48, the Second Circuit observed: "Indeed, even if a mark is registered, the presumption of an exclusive right to use it extends only so far as the goods or services noted in the registration certificate here shoes, slippers and sandals."  Plaintiff's  certificate notes the registered

---

[9]   In  this  Circuit,  expert  witnesses  frequently  give  opinion  testimony  with  respect  to  the *Polaroid* factors.  *See, e.g., McGregor-Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1136 n. 7 (2d Cir. 1979) ("Nor was it error for the district court to admit and consider the testimony of expert witnesses  called  by  Drizzle  to  establish  the  level  of  sophistication  of  the  typical  purchaser  of Drizzle's coats. . . . Under Fed. R. Evid. 702 it was entirely appropriate for the district court to admit their testimony. . . . The court also permitted these witnesses to give their opinions as to whether the typical purchasers they had described would be likely to be confused by the similarity of the two marks at issue."); *Essence Commc'ns v. Singh Indus., Inc.,* 703 F.Supp. 261, 270 (S.D.N.Y. 1988) ("Singh also offers expert witness testimony" to "show that there is no likelihood of confusion. Because both parties have offered expert opinions in support of their positions, this factor ends in a draw.").

service to be "organizing and conducting of educational conferences in the field of financial investment and finance." That is not the service Defendants provide. The strength of Plaintiff's mark for the different service it provides is not a meaningful factor in likelihood-of-confusion analysis.

For the same reason, **the similarity of the two marks**, while certainly apparent, does not support a finding of likelihood of confusion in this case. As Plaintiff repeatedly stresses, "opalesque" can be defined as "like an opal," and if Plaintiff and Defendants competed directly in the same marketplace, Defendants might have some difficulty justifying the trade name Knab, as the junior user, selected, even from a shelf of unused corporate names in a Cyprus government agency. However, the lack of proximity of the parties' services negates the significance of the similarity between the trade names they chose for their different endeavors.

The **likelihood of plaintiff's bridging the gap** is not a factor in this case because there is no evidence that OFG, justifiably satisfied with its prowess and prominence as a conference organizer and producer, has any interest or intention in branching out into the furnishing of online electronic media newsletter publication, including the offering of webinars to publication subscribers.

As I have previously noted, Knab **acted in good faith in adopting Defendants' mark.** The **quality of defendants' products** is shown by the evidence to be high, but this is not a meaningful *Polaroid* factor in any event because the parties' products are dissimilar.

\*          \*          \*          \*          \*          \*

The conclusion the Court reaches on this aspect of the case is that Plaintiff has failed to sustain its burden of proving that a likelihood of consumer confusion exists with respect to the

47

trademarks used by the parties.  Accordingly the First Claim and Second Claim in the First Amended Complaint, for violations of 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), will be dismissed with prejudice.

While evidence was adduced at the trial and arguments of counsel made with respect to Plaintiff's claims of damages caused by infringement, I do not reach that question because it is mooted by the Court's conclusion that Defendants are not liable for infringement.

Consistent with this Ruling, the Consent Order entered by Judge Droney will be vacated.

### I.     Plaintiff's Common Law Claim

Plaintiff's Third Claim invokes the Connecticut common law of unfair competition, which is said to apply to "the Defendants' aforesaid acts . . . including trademark infringement."  This claim is in reality the federal trademark infringement claim arrayed in common law clothing.  Because the federal claim fails, the state law claim fails with it.

### J.     Defendants' Counterclaim

Defendants allege in their counterclaim that Plaintiff violated CUTPA "by its actions in connection with the filing and prosecution of this lawsuit despite the fact that Plaintiff's claims are barred by waiver, estoppel and acquiescence and are otherwise moot."

This counterclaim will be dismissed.  I have found that Wellington instructed counsel, who commenced the action, after Wellington was first made aware of Opalesque's apparent expansion of its business from a media company to an organizer and producer of conventions as well. Wellington had felt no concern about Defendants' use of the name OPALESQUE when acting as a media sponsor of conventions OFG organized, but he began to think in terms of trademark

infringement when Opalesque suddenly surfaced as an apparent host of the 2008 Greenwich conference. Those thoughts were not unreasonable. OFG has not proved its trademark infringement case, but it was entitled to file the action in the first place, and to proceed to trial when the summary judgment phase was completed without resolution.

## IV.  CONCLUSIONS OF LAW

1.  The Court has subject matter jurisdiction in the case, and personal jurisdiction over the parties to it.

2.  Plaintiff's First Amended Complaint is DISMISSED with prejudice.

3.  Defendants' counterclaim is DISMISSED with prejudice.

4.  The previously entered Consent Order, Doc. 43, is VACATED.

5.  Each party shall bear its own costs and attorney's fees.

The foregoing constitutes the Judgment of the Court.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         November 3, 2014


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

49